**06 CV 5973**

COMPLAINT.DOC G:60606

UNITED STATES DISTRICT COURT
~~EASTERN~~ DISTRICT OF NEW YORK
SOUTHERN
----------------------------------------X  Case No.
DENNIS NATHAN and NAAMAN S. NATHAN,

        Plaintiffs,         COMPLAINT

   -against-              PLAINTIFFS DEMAND A
                                TRIAL BY JURY
MARK A. COOPER and JEMA G. COOPER,

        Defendants.
----------------------------------------X

*JUDGE BAER*

*RECEIVED AUG 0 4 2006 U.S.D.C. S.D. N.Y.*

    Plaintiffs DENNIS NATHAN and NAAMAN S. NATHAN, by and through their attorneys, ITKOWITZ & HARWOOD, as and for their complaint as against defendants MARK A. COOPER AND JEMA G. COOPER, hereby allege, by and through their attorneys, as follows:

    1.  At all relevant times herein, Plaintiff DENNIS NATHAN ("Plaintiff") is a natural person with a principal place of residence in the city of Allendale, State of New Jersey.

    2.  At all relevant times herein, Plaintiff NAAMAN S. NATHAN ("Plaintiff") is a natural person with a principal place of residence in the city of Lancaster, State of Pennsylvania.

    3.  At all relevant times herein, Defendants MARK A. COOPER AND JEMA G. COOPER ("Defendants") are natural

persons with a principal place of residence in the city of New York, State of New York.

4. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 by virtue of the diversity of citizenship as between Plaintiffs and Defendants, and the amount in controversy which exceeds, exclusive of interest and costs, the sum or value of seventy-five thousand dollars ($75,000.00).

## AS AND FOR A FIRST CAUSE OF ACTION

5. Upon information and belief, at all times relevant herein, Defendants were and still are the owners of the premises hereinafter described.

6. On or about May 8, 2006, Plaintiffs and Defendants entered into a contract, in writing (the "Contract"), wherein and whereby Defendants agreed to sell and Plaintiffs agreed to buy a certain cooperative apartment described as follows: 185 West End Avenue, Apartment 27FG, New York, New York 10023 (the "Premises"). A copy of the Contract is annexed hereto as Exhibit "A".

7. The agreed purchase price for the Premises was One Million Nine Hundred Thousand Dollars and No Cents ($1,900,000.00) (the "Purchase Price").

8. Upon delivery of the Contract to Defendants' attorney on or about May 2, 2006, Plaintiffs enclosed a check for the sum of One Hundred and Ninety Thousand Dollars

and No Cents ($190,000.00) on account of the Purchase Price (the "Contract Deposit").

9. Paragraph 6.1 of the Contract provided that the sale was subject to "unconditional consent" of the Co-Op Board of the Building ("the Corporation").

10. Paragraph 6.3 of the Contract ("Paragraph 6.3") provides, in pertinent part, the following:

> "Either party, after learning of the Corporation's decision, shall promptly advise the other Party thereof. . . . . If such consent is refused at any time, either Party may cancel this Contract by Notice. In the event of cancellation pursuant to this ¶ 6.3, the Escrowee shall refund the Contract Deposit to Purchaser."

11. Paragraph 32 of the Contract Rider provides:

> "If the Purchaser fails to obtain approval from the Co-Op Board as required under this contract, the Seller will return the entire down payment to Purchaser within seven (7) working days from the date of said disapproval."

12. The Corporation refused to provide consent or approval for the Plaintiffs' purchase of the property in question.

13. On or about July 17, 2006, the Plaintiffs provided notification of this refusal to the Defendants, pursuant to paragraph 6.3 of the parties' contract. This notification also contained a demand for a refund of the Contract Deposit. A copy of this notification letter is annexed hereto as Exhibit "B".

14. To date, the Contract Deposit has not been refunded to Plaintiffs.

15. Defendants have violated the parties' contract by wrongfully failing, despite demand having been made, to refund the Contract Deposit to Plaintiffs, including instructing the Escrowee to release and return the Contract Deposit funds to Plaintiffs.

16. Plaintiffs have themselves acted in good faith at all times and complied with all of the terms of the Contract.

17. That by reason of the foregoing, Plaintiffs have sustained and continue to sustain damages in an amount of $190,000.00 together with interest thereon from May 2, 2006.

18. Paragraph 13.1 of the parties' contract permits Plaintiffs to seek reasonable attorneys' fees and disbursements, court costs and litigation expenses arising from this litigation from the Defendants.

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

(a) damages in the amount of $190,000.00, including any interest earned and with additional interest thereon;

(b) an Order directing Defendants to reimburse Plaintiffs for all attorneys' fees and disbursements, court costs and litigation expenses incurred in this matter;

(c) an Order directing Defendants to reimburse Plaintiffs for all other costs, fees and expenses incurred in this matter; and

(d) granting such other and further relief as this Court may deem just, fair and proper.

Dated:   New York, New York
         August 4, 2006

                    ITKOWITZ & HARWOOD
                    Attorneys for Plaintiffs

           By:      *[signed]* Jay B. Itkowitz (by LM)
                    Jay B. Itkowitz, Esq.
                    (JBI5349          )
                    305 Broadway, 7th Floor
                    New York, New York 10007
                    (212) 822-1400 x 102

Exhibit A

Prepared by the Committee on Condominiums and Cooperatives of the Real Property Section of the New York State Bar Association
and approved by the Committee on Cooperatives and Condominiums of the Association of the Bar of the City of New York and the New York County Lawyers Association (7/01)

**CONSULT YOUR LAWYER BEFORE SIGNING THIS AGREEMENT**

## Contract of Sale -- Cooperative Apartment

This Contract is made as of ~~April~~ MAY 8, 2006 between the "Seller" and the "Purchaser" identified below.

**1  CERTAIN DEFINITIONS AND INFORMATION**

1.1 The "Parties" are:

1.1.1 "Seller": **Mark A. Cooper and Jema G. Cooper**

Prior names used by Seller:

Address: **185 West End Avenue, Apartment 27FG**
**New York, New York 10023**

S.S. No.: 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 / 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

1.1.2 "Purchaser": **Dennis Nathan and Naaman S. Nathan**

Address: **908 Woodridge Boulevard**
**Lancaster, Pennsylvania 17601**

S.S. No.: 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 / 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

1.2 The "Attorneys" are:

1.2.1 "Seller's Attorney"
Jeffrey L. Wechsler, Esq.
Jeffrey L. Wechsler, Esq.
Address: 60 East 42nd Street, Suite 2130
New York, New York 10165

Telephone: (212) 599-1900
Fax: (212) 599-0535

1.2.2 "Purchaser's Attorney"
Bradley Shaw
Bradley Shaw PC
Address: 305 Broadway
New York, New York 10007

Telephone: (212) 822-1477
Fax: (212) 822-1461

1.3 The "Escrowee" is the [Seller's] [~~Purchaser's~~] Attorney.
1.4 The Managing Agent is: **Cooper Square Management**

Address: **6 East 43rd Street**
**New York, New York**

Telephone: (212) 634-8900
Fax:

1.5 The real estate "Broker(s)" (see ¶12) is/are:
Company Name: **Halstead Property Co & Millrose Group**

1.6 The name of the cooperative housing corporation ("Corporation") is: **185 West End Avenue Owners Corp.**

1.7 The "Unit" number is: **27FG**
1.8 The Unit is located in "Premises" known as:
**185 West End Avenue**
**New York, New York 10023**

1.9 The "Shares" are the **862** shares of the Corporation allocated to the Unit.
1.10 The "Lease" is the Corporation's proprietary lease or occupancy agreement for the Unit, given by the Corporation which expires on .
1.11 "Personalty" is the following personal property, to the extent existing in the Unit on the date hereof: the refrigerators, freezers, ranges, ovens, built-in microwave ovens, dishwashers, garbage disposal units, cabinets and counters, lighting fixtures, chandeliers, wall-to-wall carpeting, plumbing and heating fixtures, central air-conditioning and/or window or sleeve units, washing machines, dryers, screens and storm windows, window treatments, switch plates, door hardware, mirrors, built-ins not excluded in ¶1.12 and

1.12 Specifically excluded from this sale is all personal property not included in ¶1.11 and: **Four (4) matching pendant light fixtures in hall**

1.13 The sale [does] [does not] include Seller's interest in [Storage]/[Servant's Rm]/[Parking Space] ("Included Interests")
1.14 The "Closing" is the transfer of ownership of the Shares and Lease.
1.15 The date scheduled for Closing is **on or about 6/20/2006** ("Scheduled Closing Date") at **Cooper Square Management**
(See ¶¶ 9 and 10)
1.16 The "Purchase Price" is: $ **1,900,000.00**
1.16.1 The "Contract Deposit" is: $ **190,000.00**
1.16.2 The "Balance" of the Purchase Price due at Closing is:
$ **1,710,000.00**           (See ¶2.2.2)
1.17 The monthly "Maintenance" charge is $ **2,733.30**
(See ¶4)
1.18 The "Assessment", if any, payable to the Corporation, at the date of this Contract is $ **None**   ~~, payable as follows:~~

1.19 [Seller] [~~Purchaser~~] shall pay the Corporation's flip tax, transfer fee (apart from the transfer agent fee) and/or waiver of option fee ("Flip Tax"), if any.
1.20 Financing Options *(Delete two of the following ¶¶1.20.1, 1.20.2 or 1.20.3*
1.20.1 ~~Purchaser may apply for financing in connection with this sale and Purchaser's obligation to purchase under this Contract is contingent upon issuance of a Loan Commitment Letter by the Loan Commitment Date (¶18.1.2).~~
1.20.2 Purchaser may apply for financing in connection with this sale but Purchaser's obligation to purchase under this Contract is not contingent upon issuance of a Loan Commitment Letter.

1.20.3 ~~Purchaser shall not apply for financing in connection with this sale.~~
1.21 If ¶1.20.1 or 1.20.2 applies, the "Financing Terms" for ¶18 are: a loan of $ 400,000.00 for a term of 30 years or such lesser amount or shorter term as applied for or acceptable to Purchaser; and the "Loan Commitment Date" for ¶18 is 30 calendar days after the Delivery Date.
1.22 The "Delivery Date" of this Contract is the date on which a fully executed counterpart of this Contract is deemed given to and received by Purchaser or Purchaser's Attorney as provided in ¶17.3.
1.23 All "Proposed Occupants" of the Unit are:
**Dennis & Naaman Nathan**
1.23.1 persons and relationship to Purchaser:
**Self**
1.23.2 pets: **none**
1.24 The Contract Deposit shall be held in [a non-] ~~[an]~~ IOLA escrow account. If the account is a non-IOLA account then interest shall be paid to the Party entitled to the Contract Deposit. The Party receiving the interest shall pay any income taxes thereon. The escrow account shall be a segregated bank account at Depository: **Citibank**
Address: **Park Avenue, New York, NY**

(See ¶27)
1.25 This Contract is ~~[not]~~ continued on attached rider(s).
2  **AGREEMENT TO SELL AND PURCHASE; PURCHASE PRICE; ESCROW**
2.1 Seller agrees to sell to Purchaser, and Purchaser agrees to purchase from Seller, the Seller's Shares, Lease, Personalty and any Included Interests and all other items included in this sale, for the Purchase Price and upon the terms and conditions set forth in this Contract.
2.2 The Purchase Price is payable to Seller by Purchaser as follows:
2.2.1 the Contract Deposit at the time of signing this Contract, by Purchaser's good check to the order of Escrowee; and
2.2.2 the Balance at Closing, only by cashier's or official bank check or certified check of Purchaser payable to the direct order of Seller. The check(s) shall be drawn on and payable by a branch of a commercial or savings bank, savings and loan association or trust company located in the same City or County as the Unit. Seller may direct, on reasonable Notice (defined in ¶17) prior to Closing, that all or a portion of the Balance shall be made payable to persons other than Seller (see ¶17.7).
3  **PERSONALTY**
3.1 Subject to any rights of the Corporation or any holder of a mortgage to which the Lease is subordinate, this sale includes all of the Seller's interest, if any, in the Personalty and the Included Interests.
3.2 No consideration is being paid for the Personalty or for the Included Interests; nothing shall be sold to Purchaser if the Closing does not occur.
3.3 Prior to Closing, Seller shall remove from the Unit all the furniture, furnishings and other property not included in this sale, and repair any damage caused by such removal.
4  **REPRESENTATIONS AND COVENANTS**

4.1 Subject to any matter affecting title to the Premises (as to which Seller makes no representations or covenants), Seller represents and covenants that:
4.1.1 Seller is, and shall at Closing be, the sole owner of the Shares, Lease, Personalty and Included Interests, with the full right, power and authority to sell and assign them. Seller shall make timely provision to satisfy existing security interest(s) in the Shares and Lease and have the same delivered at Closing (See ¶10.1);
4.1.2 the Shares were duly issued, fully paid for and are non-assessable;
4.1.3 the Lease is, and will at Closing be, in full force and effect and no notice of default under the Lease is now or will at Closing be in effect;
4.1.4 the Maintenance and Assessments payable as of the date hereof are as specified in ¶1.17 and 1.18;
4.1.5 as of this date, Seller neither has actual knowledge nor has received any written notice of any increase in Maintenance or any Assessment which has been adopted by the Board of Directors of the Corporation and is not reflected in the amounts set forth in ¶1.17 and 1.18;
4.1.6 Seller has not made any material alterations or additions to the Unit without any required consent of the Corporation or, to Seller's actual knowledge, without compliance with all applicable law. This provision shall not survive Closing.
4.1.7 Seller has not entered into, shall not enter into, and has no actual knowledge of any agreement (other than the Lease) affecting title to the Unit or its use and/or occupancy after Closing, or which would be binding on or adversely affect Purchaser after Closing (e.g. a sublease or alteration agreement);
4.1.8 Seller has been known by no other name for the past 10 years except as set forth in ¶1.1.1.
4.1.9 at Closing in accordance with ¶15.2:
4.1.9.1 there shall be no judgments outstanding against Seller which have not been bonded against collection out of the Unit ("Judgments");
4.1.9.2 the Shares, Lease, Personalty and any Included Interests shall be free and clear of liens (other than the Corporation's general lien on the Shares for which no monies shall be owed), encumbrances and adverse interests ("Liens");
4.1.9.3 all sums due to the Corporation shall be fully paid by Seller to the end of the payment period immediately preceding the date of Closing;
4.1.9.4 Seller shall not be indebted for labor or material which might give rise to the filing of a notice of mechanic's lien against the Unit or the Premises; and
4.1.9.5 no violations shall be of record which the owner of the Shares and Lease would be obligated to remedy under the Lease.
4.2 Purchaser represents and covenants that:
4.2.1 Purchaser is acquiring the Shares and Lease for residential occupancy of the Unit solely by the Proposed Occupants identified in ¶1.23
4.2.2 Purchaser is not, and within the past 7 years has not been, the subject of a bankruptcy proceeding;
4.2.3 if ¶1.20.3 applies, Purchaser shall not apply for financing in connection with this purchase.
4.2.4 Each individual comprising Purchaser is over the age of 18 and is purchasing for Purchaser's own account (beneficial and of record);
4.2.5 Purchaser shall not make any representations to the

Corporation contrary to the foregoing and shall provide all documents in support thereof required by the Corporation in connection with Purchaser's application for approval of this transaction; and

4.2.6 there are not now and shall not be at Closing any unpaid tax liens or monetary judgments against Purchaser.

4.3 Each Party covenants that its representations and covenants contained in ¶4 shall be true and complete at Closing and, except for ¶4.1.6, shall survive Closing but any action based thereon must be instituted within one year after Closing.

5  **CORPORATE DOCUMENTS**

Purchaser has examined and is satisfied with, or (except as to any matter represented in this Contract by Seller) accepts and assumes the risk of not having examined, the Lease, the Corporation's Certificate of Incorporation, By-laws, House Rules, minutes of shareholders' and directors' meetings, most recent audited financial statement and most recent statement of tax deductions available to the Corporation's shareholders under Internal Revenue Code ("IRC") §216 (or any successor statute).

6  **REQUIRED CONSENT AND REFERENCES**

6.1 This sale is subject to the unconditional consent of the Corporation.

6.2 Purchaser shall in good faith:

6.2.1 submit to the Corporation or the Managing Agent an application with respect to this sale on the form required by the Corporation, containing such data and together with such documents as the Corporation requires, and pay the applicable fees and charges that the Corporation imposes upon Purchaser. All of the foregoing shall be submitted within 10 business days after the Delivery Date, or, if ¶¶ 1.20.1 or 1.20.2 applies and the Loan Commitment Letter is required by the Corporation, within 3 business days after the earlier of (i) the Loan Commitment Date (defined in ¶1.21) or (ii) the date of receipt of the Loan Commitment Letter (defined in ¶18.1.2);

6.2.2 attend (and cause any Proposed Occupant to attend) one or more personal interviews, as requested by the Corporation; and

6.2.3 promptly submit to the Corporation such further references, data and documents reasonably requested by the Corporation.

6.3 Either Party, after learning of the Corporation's decision, shall promptly advise the other Party thereof. If the Corporation has not made a decision on or before the Scheduled Closing Date, the Closing shall be adjourned for 30 business days for the purpose of obtaining such consent. If such consent is not given by such adjourned date, either Party may cancel this Contract by Notice, provided that the Corporation's consent is not issued before such Notice of cancellation is given. If such consent is refused at any time, either Party may cancel this Contract by Notice. In the event of cancellation pursuant to this ¶6.3, the Escrowee shall refund the Contract Deposit to Purchaser.

6.4 If such consent is refused, or not given, due to Purchaser's bad faith conduct, Purchaser shall be in default and ¶13.1 shall govern.

7  **CONDITION OF UNIT AND PERSONALTY;**

**POSSESSION**

7.1 Seller makes no representation as to the physical condition or state of repair of the Unit, the Personalty, the Included Interests or the Premises. Purchaser has inspected or waived inspection of the Unit, the Personalty and the Included Interests and shall take the same "as is", as of the date of this Contract, except for reasonable wear and tear. However, at the time of Closing, the appliances shall be in working order and required smoke detector(s) shall be installed and operable.

7.2 At Closing, Seller shall deliver possession of the Unit, Personalty and Included Interests in the condition required by ¶7.1, broom-clean, vacant and free of all occupants and rights of possession.

8  **RISK OF LOSS**

8.1 The provisions of General Obligations Law Section 5-1311, as modified herein, shall apply to this transaction as if it were a sale of realty. For purposes of this paragraph, the term "Unit" includes built-in Personalty.

8.2 Destruction shall be deemed "material" under GOL 5-1311, if the reasonably estimated cost to restore the Unit shall exceed 5% of the Purchase Price.

8.3 In the event of any destruction of the Unit or the Premises, when neither legal title nor the possession of the Unit has been transferred to Purchaser, Seller shall give Notice of the loss to Purchaser ("Loss Notice") by the earlier of the date of Closing or 7 business days after the date of the loss.

8.4 If there is material destruction of the Unit without fault of Purchaser, this Contract shall be deemed canceled in accordance with ¶16.3, unless Purchaser elects by Notice to Seller to complete the purchase with an abatement of the Purchase Price; or

8.5 Whether or not there is any destruction of the Unit, if, without fault of Purchaser, more than 10% of the units in the Premises are rendered uninhabitable, or reasonable access to the Unit is not available, then Purchaser shall have the right to cancel this Contract in accordance with ¶16.3 by Notice to Seller.

8.6 Purchaser's Notice pursuant to ¶8.4 or ¶8.5 shall be given within 7 business days following the giving of the Loss Notice except that if Seller does not give a Loss Notice, Purchaser's Notice may be given at any time at or prior to Closing

8.7 In the event of any destruction of the Unit, Purchaser shall not be entitled to an abatement of the Purchase Price (i) that exceeds the reasonably estimated cost of repair and restoration or (ii) for any loss that the Corporation is obliged to repair or restore; but Seller shall assign to Purchaser, without recourse, Seller's claim, if any, against the Corporation with respect to such loss.

9  **CLOSING LOCATION**

The Closing shall be held at the location designated by the Corporation or, if no such designation is made, at the office of Seller's Attorney.

10  **CLOSING**

10.1 At Closing, Seller shall deliver or cause to be delivered:

10.1.1 Seller's certificate for the Shares duly endorsed for transfer to Purchaser or accompanied by a separate duly executed stock power to Purchaser, and in either case, with any guarantee of Seller's signature required by the Corporation;

10.1.2 Seller's counterpart original of the Lease, all assignments and assumptions in the chain of title and a

      duly executed assignment thereof to Purchaser in the form required by the Corporation;
10.1.3 FIRPTA documents required by ¶25;
10.1.4 keys to the Unit, building entrance(s), and, if applicable, garage, mailbox, storage unit and any locks in the Unit;
10.1.5 if requested, an assignment to Purchaser of Seller's interest in the Personalty and Included Interests;
10.1.6 any documents and payments to comply with ¶15.2
10.1.7 If Seller is unable to deliver the documents required in ¶¶10.1.1 or 10.1.2 then Seller shall deliver or cause to be delivered all documents and payments required by the Corporation for the issuance of a new certificate for the Shares or a new Lease.
10.2 At Closing, Purchaser shall:
10.2.1 pay the Balance in accordance with ¶2.2.2;
10.2.2 execute and deliver to Seller and the Corporation an agreement assuming the Lease, in the form required by the Corporation; and
10.2.3 if requested by the Corporation, execute and deliver counterparts of a new lease substantially the same as the Lease, for the balance of the Lease term, in which case the Lease shall be canceled and surrendered to the Corporation together with Seller's assignment thereof to Purchaser.
10.3 At Closing, the Parties shall complete and execute all documents necessary:
10.3.1 for Internal Revenue Service ("IRS") form 1099-S or other similar requirements;
10.3.2 to comply with smoke detector requirements and any applicable transfer tax filings; and
10.3.3 to transfer Seller's interest, if any, in and to the Personalty and Included Interests.
10.4 Purchaser shall not be obligated to close unless, at Closing, the Corporation delivers:
10.4.1 to Purchaser a new certificate for the Shares in the name of Purchaser; and
10.4.2 a written statement by an officer or authorized agent of the Corporation consenting to the transfer of the Shares and Lease to Purchaser and setting forth the amounts of and payment status of all sums owed by Seller to the Corporation, including Maintenance and any Assessments, and the dates to which each has been paid.

11 **CLOSING FEES, TAXES AND APPORTIONMENTS**
11.1 At or prior to Closing,
11.1.1 Seller shall pay, if applicable:
11.1.1.1 the cost of stock transfer stamps; and
11.1.1.2 transfer taxes, except as set forth in ¶11.1.2.2
11.1.2 Purchaser shall pay, if applicable:
11.1.2.1 any fee imposed by the Corporation relating to Purchaser's financing; and
11.1.2.2 transfer taxes imposed by statute primarily on Purchaser (e.g., the "mansion tax").
11.2 The Flip Tax, if any, shall be paid by the Party specified in ¶1.19.
11.3 Any fee imposed by the Corporation and not specified in this Contract shall be paid by the Party upon whom such fee is expressly imposed by the Corporation, and if no Party is specified by the Corporation, then such fee shall be paid by Seller.
11.4 The Parties shall apportion as of 11:59 P.M. of the day preceding the Closing, the Maintenance, any other periodic charges due the Corporation (other than Assessments) and STAR Tax Exemption (if the Unit is the beneficiary of same), based on the number of the days in the month of Closing.
11.5 Assessments, whether payable in a lump sum or installments, shall not be apportioned, but shall be paid by the Party who is the owner of the Shares on the date specified by the Corporation for payment. Purchaser shall pay any installments payable after Closing provided Seller had the right and elected to pay the Assessment in installments.
11.6 Each Party shall timely pay any transfer taxes for which it is primarily liable pursuant to law by cashier's, official bank, certified, or attorney's escrow check. This ¶11.6 shall survive Closing.
11.7 Any computational errors or omissions shall be corrected within 6 months after Closing. This ¶11.7 shall survive Closing.

12 **BROKER**
12.1 Each Party represents that such Party has not dealt with any person acting as a broker, whether licensed or unlicenced, in connection with this transaction other than the Broker(s) named in ¶1.5.
12.2 Seller shall pay the Broker's commission pursuant to a separate agreement. The Broker(s) shall not be deemed to be a third-party beneficiary of this Contract.
12.3 This ¶12 shall survive Closing, cancellation or termination of this Contract.

13 **DEFAULTS, REMEDIES AND INDEMNITIES**
13.1 In the event of a default or misrepresentation by Purchaser, Seller's sole and exclusive remedies shall be to cancel this Contract, retain the Contract Deposit as liquidated damages and, if applicable, Seller may enforce the indemnity in ¶13.3 as to brokerage commission or sue under ¶13.4. Purchaser prefers to limit Purchaser's exposure for actual damages to the amount of the Contract Deposit, which Purchaser agrees constitutes a fair and reasonable amount of compensation for Seller's damages under the circumstances and is not a penalty. The principles of real property law shall apply to this liquidated damages provision.
13.2 In the event of a default or misrepresentation by Seller, Purchaser shall have such remedies as Purchaser is entitled to at law or in equity, including specific performance, because the Unit and possession thereof cannot be duplicated.
13.3 Subject to the provisions of ¶4.3, each Party indemnifies and holds harmless the other against and from any claim, judgment, loss, liability, cost or expense resulting from the indemnitor's breach of any of its representations or covenants stated to survive Closing, cancellation or termination of this Contract. Purchaser indemnifies and holds harmless Seller against and from any claim, judgment, loss, liability, cost or expense resulting from the Lease obligations accruing from and after the Closing. Each indemnity includes, without limitation, reasonable attorneys' fees and disbursements, court costs and litigation expenses arising from the defense of any claim and enforcement or collection of a judgment under this indemnity, provided the indemnitee is given Notice and opportunity to defend the claim. This ¶13.3 shall survive Closing, cancellation or termination of this Contract.
13.4 In the event any instrument for the payment of the

Contract Deposit fails of collection, Seller shall have the right to sue on the uncollected instrument. In addition, such failure of collection shall be a default under this Contract, provided Seller gives Purchaser Notice of such failure of collection and, within 3 business days after Notice is given, Escrowee does not receive from Purchaser an unendorsed good certified check, bank check or immediately available funds in the amount of the uncollected funds. Failure to cure such default shall entitle Seller to the remedies set forth in ¶13.1 and to retain all sums as may be collected and/or recovered.

14  **ENTIRE AGREEMENT; MODIFICATION**
14.1 All prior oral or written representations, understandings and agreements had between the Parties with respect to the subject matter of this Contract, and with the Escrowee as to ¶27, are merged in this Contract, which alone fully and completely expresses the Parties' and Escrowee's agreement.
14.2 The Attorneys may extend in writing any of the time limitations stated in this Contract. Any other provision of this Contract may be changed or waived only in writing signed by the Party or Escrowee to be charged.

15  **REMOVAL OF LIENS AND JUDGMENTS**
15.1 Purchaser shall deliver or cause to be delivered to Seller or Seller's Attorney, not less than 10 calendar days prior to the Scheduled Closing Date a Lien and Judgment search, except that Liens or Judgments first disclosed in a continuation search shall be reported to Seller within 2 business days after receipt thereof, but not later than the Closing. Seller shall have the right to adjourn the Closing pursuant to ¶16 to remove any such Liens and Judgments. Failure by Purchaser to timely deliver such search or continuation search shall not constitute a waiver of Seller's covenants in ¶4 as to Liens and Judgments. However, if the Closing is adjourned solely by reason of untimely delivery of the Lien and Judgment search, the apportionments under ¶11.3 shall be made as of 11:59 P.M. of the day preceding the Scheduled Closing Date in ¶1.15
15.2 Seller, at Seller's expense, shall obtain and deliver to the Purchaser the documents and payments necessary to secure the release, satisfaction, termination and discharge or removal of record of any Liens and Judgments. Seller may use any portion of the Purchase Price for such purposes.
15.3 This ¶15 shall survive Closing.

16  **SELLER'S INABILITY**
16.1 If Seller shall be unable to transfer the items set forth in ¶2.1 in accordance with this Contract for any reason other than Seller's failure to make a required payment or other willful act or omission, then Seller shall have the right to adjourn the Closing for periods not exceeding 60 calendar days in the aggregate, but not extending beyond the expiration of Purchaser's Loan Commitment Letter, if ¶¶1.20.1 or 1.20.2 applies.
16.2 If Seller does not elect to adjourn the Closing or (if adjourned) on the adjourned date of Closing Seller is still unable to perform, then unless Purchaser elects to proceed with the Closing without abatement of the Purchase Price, either Party may cancel this Contract on Notice to the other Party given at any time thereafter.
16.3 In the event of such cancellation, the sole liability of Seller shall be to cause the Contract Deposit to be refunded to Purchaser and to reimburse Purchaser for the actual costs incurred for Purchase's lien and title search, if any.

17  **NOTICES AND CONTRACT DELIVERY**
17.1 Any notice or demand ("Notice") shall be in writing and delivered either by hand, overnight delivery or certified or registered mail, return receipt requested, to the Party and simultaneously, in like manner, to such Party's Attorney, if any, and to Escrowee at their respective addresses or to such other address as shall hereafter be designated by Notice given pursuant to this ¶17.
17.2 The Contract may be delivered as provided in ¶17.1 or by ordinary mail.
17.3 The Contract or each Notice shall be deemed given and received:
17.3.1 on the day delivered by hand;
17.3.2 on the business day following the date sent by overnight delivery;
17.3.3 on the 5th business day following the date sent by certified or registered mail; or
17.3.4 as to the Contract only, 3 business days following the date of ordinary mailing.
17.4 A Notice to Escrowee shall be deemed given only upon actual receipt by Escrowee.
17.5 The Attorneys are authorized to give and receive any Notice on behalf of their respective clients.
17.6 Failure or refusal to accept a Notice shall not invalidate the Notice.
17.7 Notice pursuant to ¶¶2.2.2 and 13.4 may be delivered by confirmed facsimile to the Party's Attorney and shall be deemed given when transmission is confirmed by sender's facsimile machine.

18  **FINANCING PROVISIONS**
18.1 The provisions of ¶¶18.1 and 18.2 are applicable only if ¶¶1.20.1 or 1.20.2 applies.
18.1.1 An "Institutional Lender" is any of the following that is authorized under Federal or New York State law to issue a loan secured by the Shares and Lease and is currently extending similarly secured loan commitments in the county in which the Unit is located: a bank, savings bank, savings and loan association, trust company, credit union of which Purchaser is a member, mortgage banker, insurance company or governmental entity.
18.1.2 A "Loan Commitment Letter" is a written offer from an Institutional Lender to make a loan on the Financing Terms (see ¶1.21) at prevailing fixed or adjustable interest rates and on other customary terms generally being offered by Institutional Lenders making cooperative share loans. An offer to make a loan conditional upon obtaining an appraisal satisfactory to the Institutional Lender shall not become a Loan Commitment Letter unless and until such condition is met. An offer conditional upon any factor concerning Purchaser (e.g. sale of current home, payment of outstanding debt, no material adverse change in Purchaser's financial condition, etc.) is a Loan Commitment Letter whether or not such condition is met. Purchaser accepts the risk that, and cannot cancel this Contract if, any condition concerning Purchaser is not met.

18.2 Purchaser, directly or through a mortgage broker registered pursuant to Article 12-D of the Banking Law, shall diligently and in good faith:

18.2.1 apply only to an Institutional Lender for a loan on the Financing Terms (see ¶1.21) on the form required by the Institutional Lender containing truthful and complete information, and submit such application together with such documents as the Institutional Lender requires, and pay the applicable fees and charges of the Institutional Lender, all of which shall be performed within 5 business days after the Delivery Date;

18.2.2 promptly submit to the Institutional Lender such further references, data and documents requested by the Institutional Lender; and

18.2.3 accept a Loan Commitment Letter meeting the Financing Terms and comply with all requirements of such Loan Commitment Letter (or any other loan commitment letter accepted by Purchaser) and of the Institutional Lender in order to close the loan; and

18.2.4 furnish Seller with a copy of the Loan Commitment Letter promptly after Purchaser's receipt thereof.

18.2.5 Purchaser is not required to apply to more than one Institutional Lender.

18.3 If ¶1.20.1 applies, then

18.3.1 provided Purchaser has complied with all applicable provisions of ¶18.2 and this ¶18.3, Purchaser may cancel this Contract as set forth below, if:

18.3.1.1 any Institutional Lender denies Purchaser's application in writing prior to the Loan Commitment Date (see ¶1.21); or

18.3.1.2 a Loan Commitment Letter is not issued by the Institutional Lender on or before the Loan Commitment Date; or

18.3.1.3 any requirement of the Loan Commitment Letter other than one concerning Purchaser is not met (e.g. failure of the Corporation to execute and deliver the Institutional Lender's recognition agreement or other document, financial condition of the Corporation, owner occupancy quota, etc.); or

18.3.1.4 (i) the Closing is adjourned by Seller or the Corporation for more than 30 business days from the Scheduled Closing Date and (ii) the Loan Commitment Letter expires on a date more than 30 business days after the Scheduled Closing Date and before the new date set for Closing pursuant to this paragraph and (iii) Purchaser is unable in good faith to obtain from the Institutional Lender an extension of the Loan Commitment Letter or a new Loan Commitment Letter on the Financing Terms without paying additional fees to the Institutional Lender, unless Seller agrees, by Notice to Purchaser within 5 business days after receipt of Purchaser's Notice of cancellation on such ground, that Seller will pay such additional fees and Seller pays such fees when due. Purchaser may not object to an adjournment by Seller for up to 30 business days solely because the Loan Commitment Letter would expire before such adjourned Closing date.

18.3.2 Purchaser shall deliver Notice of cancellation to Seller within 5 business days after the Loan Commitment Date if cancellation is pursuant to ¶18.3.1.1 or 18.3.1.2 and on or prior to the Scheduled Closing Date if cancellation is pursuant to ¶18.3.1.3 or 18.3.1.4.

18.3.3 If cancellation is pursuant to ¶18.3.1.1, then Purchaser shall deliver to Seller, together with Purchaser's Notice, a copy of the Institutional Lender's written denial of Purchaser's loan application. If cancellation is pursuant to ¶18.3.1.3, then Purchaser shall deliver to Seller together with Purchaser's Notice evidence that a requirement of the Institutional Lender was not met.

18.3.4 Seller may cancel this Contract by Notice to Purchaser, sent within 5 days after the Loan Commitment Date, if Purchaser shall not have sent by then either (i) Purchaser's Notice of cancellation or (ii) a copy of the Loan Commitment Letter to Seller, which cancellation shall become effective if Purchaser does not deliver a copy of such Loan Commitment Letter to Seller within 10 business days after the Loan Commitment Date.

18.3.5 Failure by either Purchaser or Seller to deliver Notice of cancellation as required by this ¶18.3 shall constitute a waiver of the right to cancel under this ¶18.3.

18.3.6 If this Contract is canceled by Purchaser pursuant to this ¶18.3, then thereafter neither Party shall have any further rights against, or obligations or liabilities to, the other by reason of this Contract, except that the Contract Deposit shall be promptly refunded to Purchaser and except as set forth in ¶12. If this Contract is canceled by Purchaser pursuant to ¶18.3.1.4, then Seller shall reimburse Purchaser for any non-refundable financing and inspection expenses and other sums reimbursable pursuant to ¶16

18.3.7 Purchaser cannot cancel this Contract pursuant to ¶ 18.3.1.4 and cannot obtain a refund of the Contract Deposit if the Institutional Lender fails to fund the loan:

18.3.7.1 because a requirement of the Loan Commitment Letter concerning Purchaser is not met (e.g., Purchaser's financial condition or employment status suffers an adverse change; Purchaser fails to satisfy a condition relating to the sale of an existing residence, etc.) or

18.3.7.2 due to the expiration of a Loan Commitment Letter issued with an expiration date that is not more than 30 business days after the Scheduled Closing Date.

19  SINGULAR/PLURAL AND JOINT/SEVERAL

The use of the singular shall be deemed to include the plural and vice versa, whenever the context so requires. If more than one person constitutes Seller or Purchaser, their obligations as such Party shall be joint and several.

20  NO SURVIVAL

No representation and/or covenant contained herein shall survive Closing except as expressly provided. Payment of the Balance shall constitute a discharge and release by Purchaser of all of Seller's obligations hereunder except those expressly stated to survive Closing.

21  INSPECTIONS

Purchaser and Purchaser's representatives shall have the right to inspect the Unit within 48 hours prior to Closing, and at other reasonable times upon reasonable request to Seller.

22  GOVERNING LAW AND VENUE

This Contract shall be governed by the laws of the State of New York without regard to principles of conflict of laws. Any action or proceeding arising out of this Contract shall be

brought in the county or Federal district where the Unit is located and the Parties hereby consent to said venue.

### 23 NO ASSIGNMENT BY PURCHASER; DEATH OF PURCHASER

23.1 Purchaser may not assign this Contract or any of Purchaser's rights hereunder. Any such purported assignment shall be null and void.

23.2 This Contract shall terminate upon the death of all persons comprising Purchaser and the Contract Deposit shall be refunded to the Purchaser. Upon making such refund and reimbursement, neither Party shall have any further liability or claim against the other hereunder, except as set forth in Par. 12.

### 24 COOPERATION OF PARTIES

24.1 The Parties shall each cooperate with the other, the Corporation and Purchaser's Institutional Lender and title company, if any, and obtain, execute and deliver such documents as are reasonably necessary to consummate this sale.

24.2 The Parties shall timely file all required documents in connection with all governmental filings that are required by law. Each Party represents to the other that its statements in such filings shall be true and complete. This ¶24.2 shall survive Closing.

### 25 FIRPTA

The parties shall comply with IRC §§ 897, 1445 and the regulations thereunder as same may be amended ("FIRPTA"). If applicable, Seller shall execute and deliver to Purchaser at Closing a Certification of Non-Foreign Status ("CNS") or deliver a Withholding Certificate from the IRS. If Seller fails to deliver a CNS or a Withholding Certificate, Purchaser shall withhold from the Balance, and remit to the IRS, such sum as may be required by law. Seller hereby waives any right of action against Purchaser on account of such withholding and remittance. This ¶25 shall survive Closing.

### 26 ADDITIONAL REQUIREMENTS

26.1 Purchaser shall not be obligated to close unless all of the following requirements are satisfied at the time of the Closing:

26.1.1 the Corporation is in good standing;

26.1.2 the Corporation has fee or leasehold title to the Premises, whether or not marketable or insurable; and

26.1.3 there is no pending *in rem* action, tax certificate/lien sale or foreclosure action of any underlying mortgage affecting the Premises.

26.2 If any requirement in ¶26.1 is not satisfied at the time of the Closing, Purchaser shall give Seller Notice and if the same is not satisfied within a reasonable period of time thereafter, then either Party may cancel this Contract (pursuant to ¶16.3) by Notice.

### 27 ESCROW TERMS

27.1 The Contract Deposit shall be deposited by Escrowee in an escrow account as set forth [in ¶] 1.24 and the proceeds held and disbursed in accordance with the terms of this Contract. At Closing, the Contract Deposit shall be paid by Escrowee to Seller. If the Closing does not occur and either Party gives Notice to Escrowee demanding payment of the Contract Deposit, Escrowee shall give prompt Notice to the other Party of such demand. If Escrowee does not receive a Notice of objection to the proposed payment from such other Party within 10 business days after the giving of Escrowee's Notice, Escrowee is hereby authorized and directed to make such payment to the demanding party. If Escrowee does receive such a Notice of objection within said period, or if for any reason Escrowee in good faith elects not to make such payment, Escrowee may continue to hold the Contract Deposit until otherwise directed by a joint Notice by the Parties or a final, non-appealable judgment, order or decree of a court of competent jurisdiction. However, Escrowee shall have the right at any time to deposit the Contract Deposit and the interest thereon, if any, with the clerk of a court in the county as set forth in ¶22 and shall give Notice of such deposit to each Party. Upon disposition of the Contract Deposit and interest thereon, if any, in accordance with this ¶27, Escrowee shall be released and discharged of all escrow obligations and liabilities.

27.2 The Party whose Attorney is Escrowee shall be liable for loss of the Contract Deposit. If the Escrowee is Seller's attorney, then Purchaser shall be credited with the amount of the contract Deposit at Closing.

27.3 Escrowee will serve without compensation. Escrowee is acting solely as a stakeholder at the Parties' request and for their convenience. Escrowee shall not be liable to either Party for any act or omission unless it involves bad faith, willful disregard of this Contract or gross negligence. In the event of any dispute, Seller and Purchaser shall jointly and severally (with right of contribution) defend (by attorneys selected by Escrowee), indemnify and hold harmless Escrowee from and against any claim, judgment, loss, liability, cost and expenses incurred in connection with the performance of Escrowee's acts or omissions not involving bad faith, willful disregard of this Contract or gross negligence. This indemnity includes, without limitation, reasonable attorneys' fees either paid to retain attorneys or representing the fair value of legal services rendered by Escrowee to itself and disbursements, court costs and litigation expenses.

27.4 Escrowee acknowledges receipt of the Contract Deposit, by check subject to collection.

27.5 Escrowee agrees to the provisions of this ¶27.

27.6 If Escrowee is the Attorney for a Party, Escrowee shall be permitted to represent such Party in any dispute or lawsuit.

27.7 This ¶27 shall survive Closing, cancellation or termination of this Contract.

### 28 MARGIN HEADINGS

The margin headings do not constitute part of the text of this Contract.

### 29 MISCELLANEOUS

This Contract shall not be binding unless and until Seller delivers a fully executed counterpart of this Contract to Purchaser (or Purchaser's Attorney) pursuant to ¶17.2 and 17.3. This Contract shall bind and inure to the benefit of the Parties hereto and their respective heirs, personal and legal representatives and successors in interest.

### 30 LEAD PAINT

If applicable, the complete and fully executed Disclosure of Information on Lead Based Paint and or Lead-Based Paint Hazards is attached hereto and made a part hereof.

IN WITNESS WHEREOF, the Parties hereto have duly executed this Contract as of the date first above written.

SELLER:

_____
Mark A. Cooper

_____
Jemy G. Cooper

_____

PURCHASER:

_____
Dennis Nathan

_____
Naaman S. Nathan

_____

ESCROW TERMS AGREED TO:

By: _____

ESCROWEE

by deleting the words "like manner" in the third line and replacing them with the words "any of the foregoing manners and

Paragraph 17.2 of the printed portion of this Contract is amended by adding after the word "mailing" in the last line the words "or on the business day following the date of transmission if sent by telecopier as provided in Paragraph 17.1"

38. Modifying paragraph 23.2, delete the word "all" after the phase "this contract shall terminate upon the death of" and insert the phase "one or more"

SELLERS:

_____
Mark A. Cooper

_____
Jenna G. Cooper

PURCHASERS:

_____
Naaman S. Nathan

_____
Dennis Nathan

# DISCLOSURE OF INFORMATION ON LEAD-BASED PAINT AND LEAD-BASED PAINT HAZARDS

**Lead Warning Statement**
Every purchaser of any interest in residential real property on which a residential dwelling was built prior to 1978 is notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavioral problems, and impaired memory. Lead poisoning also poses a particular risk to pregnant women. The seller of any interest in residential real property is required to provide the buyer with any information on lead-based paint hazards from risk assessments or inspections in the seller's possession and notify the buyer of any known lead-based paint hazards. A risk assessment or inspection for possible lead-based paint hazards is recommended prior to purchase.

**Seller's Disclosure** (initial)
_____ (a) Presence of lead-based paint and/or lead-based paint hazards (check one below):
      [ ] Known lead-based paint and/or lead-based paint hazards are present in the housing (explain).

      _____

      [x] Seller has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.
_____ (b) Records and reports available to the seller (check one below):
      [ ] Seller has provided the purchaser with all available records and reports pertaining to lead-based paint and/or lead-based paint hazards in the housing (list documents below).

      _____

      [x] Seller has no reports or records pertaining to lead-based paint and/or lead-based paint hazards in the housing.

**Purchaser's Acknowledgment** (initial)
_____ (c) Purchaser has received copies of all information listed above.
_____ (d) Purchaser has received the pamphlet *Protect Your Family from Lead in Your Home.*
_____ (e) Purchaser has (check one below):
      [ ] Received a 10-day opportunity (or mutually agreed upon period) to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards; or
      [x] Waived the opportunity to conduct a risk assessment or inspection for the presence of lead-based paint and/or lead-based paint hazards.

**Agent's Acknowledgment** (initial)
_____ (f) Agent has informed the seller of the seller's obligations under 42 U.S.C. 4852(d) and is aware of his/her responsibility to ensure compliance.

**Certification of Accuracy**
The following parties have reviewed the information above and certify, to the best of their knowledge, that the information provided by the signatory is true and accurate.

_____ _____    _____ _____
Seller Mark A. Cooper     Date        Seller Jema G. Cooper    Date

_____ _____    _____ _____
Agent                     Date        Agent                    Date

_____ _____    _____ _____
Purchaser Dennis Nathan   Date        Purchaser Naaman S. Nathan Date

NYSBA's Residential Real Estate Forms (9/03)                    © 2005 Matthew Bender & Co., a member of the LexisNexis Group.

Exhibit B

# Bradley D. Shaw, P.C.
## Attorney at Law
### 305 Broadway – 7th Fl.
### New York, NY 10007

Facsimile: 212.822.1461
Email: bdshaw66@yahoo.com

**VIA Facsimile to 212-599-0535**
**& Federal Express**

July 17, 2006

Jeffrey L. Wechsler, Esq.
60 East 42nd St. – Suite 2130
New York, NY 10165

RE: **Demand for Return of Contract Deposit**
**Cooper to Nathan**
**Premises: 185 West End Ave. – Apt. 27FG**
**New York, NY**

Dear Mr. Wechsler:

I have been advised by Victor Millrose, the Purchasers' real estate broker, that my clients application to purchase the above referenced premises has been denied. As my clients believe they have acted in good faith throughout this transaction I request that you return the contact deposit of $190,000.00 immediately.

In the event that you as escrow agent or your clients refuse to authorize the release of said Deposit, you are advised that my clients' objection to your actions and you are directed to continue to hold said deposit pending further notice.

Very truly yours,

Bradley D. Shaw